IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 15, 2018 Session

**STATE OF TENNESSEE v. MARIO M. WASHINGTON, JR.**

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2015-CR-84      Suzanne Lockert-Mash, Judge**

_____

**No. M2017-01601-CCA-R3-CD**

_____

The Defendant, Mario M. Washington, Jr., pleaded guilty in the Dickson County Circuit Court to unlawful possession of a firearm, a Class D felony, possession of a Schedule II drug, a Class A misdemeanor, and possession of a Schedule IV drug, a Class A misdemeanor. *See* T.C.A. §§ 39-17-1307(b)(1)(B) (2014) (unlawful possession of a firearm), 39-17-418 (possession of a controlled substance) (2014) (amended 2016). Pursuant to the plea agreement, the Defendant received a five-year sentence and reserved a certified question of law regarding the search of his residence, which he presents on appeal. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Timothy V. Potter, Dickson, Tennessee, for the appellant, Mario M. Washington, Jr.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Ray Crouch, District Attorney General; and Sarah Wojnarowski, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On October 4, 2002, the Defendant was convicted of drug-related offenses and received an effective fourteen-year sentence. The record reflects that the Defendant signed a community corrections agreement on August 11, 2003, and that he was later placed on probation. The record does not indicate when the Defendant was transferred from community corrections to probation.

This case arises from a May 22, 2014 warrantless search of the Defendant's home. The Defendant filed a motion to suppress the evidence, contending that police officers did not have reasonable suspicion to conduct the search.

At the motion to suppress hearing, Probation Officer Austin Frye testified that the Defendant signed an April 3, 2014 probation agreement, which stated the Defendant agreed to a warrantless search of his home at any time. Mr. Frye stated that he accompanied Detective Ethridge, Officer Mann, and Officer Beasley to the Defendant's home on May 22, 2014, and that the Defendant had previously reported living at a different address. Mr. Frye said that he and Officer Mann knocked on the front door of the home and that the other two officers "watched around the perimeter of the house." Mr. Frye stated that the Defendant answered the door after about five to ten minutes and that he could not recall whether he or Officer Mann initially spoke to the Defendant. Mr. Frye said that he told the Defendant "it would be in his best interest to cooperate, to do what was asked." When asked whether the officers explained their "purpose for being there," Mr. Frye responded "correct." Mr. Frye said that the Defendant allowed the officers to enter his home to conduct the search. Mr. Frye stated that unspecified illegal items were seized during the search, that a probation violation was filed, and that the Defendant was charged with multiple offenses.

On cross-examination, Mr. Frye testified that the Defendant did not sign a probation agreement until April 2014 and that the Defendant was placed on probation sometime before April 2014 and before Mr. Frye became employed as a probation officer. Mr. Frye stated that he discovered that the Defendant's file did not contain a probation agreement in April 2014, which was when the Defendant signed the agreement. Mr. Frye said that the Defendant was initially placed on community corrections and that the Defendant had signed a community corrections agreement. Mr. Frye stated that the Defendant could not refuse to sign the required probation agreement.

Mr. Frye testified that he and the other officers arrived at the Defendant's home at about 7:00 a.m., that none of the officers had "weapons drawn," and that the blue lights were not activated on any of their police cars. Mr. Frye stated that the Defendant verbally consented to the search and that the Defendant's girlfriend was also at the home. Mr. Frye said that he did not know whether the Defendant had an option to refuse the search because the Defendant had signed a probation agreement and that the Defendant would have violated probation if he had refused.

Upon questioning by the trial court, Mr. Frye testified that he and Officer Mann explained to the Defendant that they were at the home to conduct a probation-related search, that the Defendant consented to the search, and that the Defendant allowed officers in his home. Officer Mann stated that one of the officers brought a police dog to the home and that Officer Mann stayed outside with the Defendant and the Defendant's girlfriend while the search was conducted. Mr. Frye said that before the search, he was

informed by the drug task force that "there may be some other activity going on that may be against the rules of probation and that they wanted to do a probationary search" of the Defendant's home.

Dickson Police Detective Josh Ethridge testified that he was an officer on the drug task force at the time of the search, that "it was pretty common knowledge" the Defendant sold drugs, and that the drug task force had received anonymous telephone calls "from time to time" stating that the Defendant sold drugs from his home and place of employment. Detective Ethridge said that he knew the Defendant had previous drug-related convictions and was on probation.

Detective Ethridge testified that the drug task force investigated Murray Mitchell Daniel in March 2014, that Detective Ethridge and other officers performed a probation-related search of Mr. Daniel's place of employment and home, and that the officers seized four ounces of cocaine from the home. Detective Ethridge said that Mr. Daniel came to his office a few days later and that Mr. Daniel reported purchasing the four ounces of cocaine from the Defendant and purchasing cocaine at the Defendant's home "consistently." Detective Ethridge stated that Mr. Daniel told him that the Defendant stored cocaine in a container in the Defendant's home, weighed it on scales, and packaged it in "bags." Detective Ethridge stated that Mr. Daniel informed him that on other occasions, Mr. Daniel met the Defendant at a predetermined location to purchase cocaine, which was already "bagged" and weighed. Detective Ethridge said that Mr. Daniel agreed to work as a confidential informant but that Mr. Daniel never made any controlled purchases from the Defendant.

Detective Ethridge testified that the drug task force had received anonymous telephone calls relative to the Defendant's selling drugs and that the Defendant had previously served as a confidential informant. Detective Ethridge stated that he had "gotten wind" where the Defendant lived and recognized the Defendant's cars in the driveway on multiple occasions. Detective Ethridge said that a surveillance video camera was placed on a "pole" outside of the Defendant's home and that the surveillance footage reflected very little activity.

Detective Ethridge testified that he and other officers went to the Defendant's home, that he waited in the driveway while Mr. Frye and Officer Mann knocked on the door, and that the Defendant consented to a search. Detective Ethridge stated that officers seized a "marijuana grinder," multiple sandwich bags, a stolen .38-caliber handgun, multiple types of "narcotic medicine," pill bottles, three "pipes," scales, rolling papers, and one plastic spoon that tested positive for cocaine. Detective Ethridge said that officers found "residual powder" inside a metal canister in the master bedroom and white powder on the floor of a spare bedroom and that a field test of the powder was positive for cocaine. Detective Ethridge stated that officers searched a car in the

driveway of the home, that officers found a cigar containing a "green plant material," and that officers discovered residual "green plant material" in the ashtray.

Detective Ethridge testified that the items seized from the Defendant's home, such as the plastic spoon and metal canister, were consistent with the information Mr. Daniel provided. Detective Ethridge stated that the Defendant never withdrew his consent for the search.

On cross-examination, Detective Ethridge testified that he did not have any information corroborating the anonymous telephone calls he received relative to the Defendant's selling drugs and that the drug task force did not verify the veracity of the telephone calls. Detective Ethridge stated that a GPS tracking device was placed on Mr. Daniel's vehicle before the search of Mr. Daniel's home because of Mr. Daniel's suspected drug activity. Detective Ethridge said that the GPS information never showed Mr. Daniel traveling to the Defendant's home. Detective Ethridge stated that no video recordings existed from the surveillance camera because the footage of the Defendant's home was "live stream." Detective Ethridge acknowledged that images from the surveillance camera did not corroborate Mr. Daniel's claim that the Defendant sold cocaine from his home.

Detective Ethridge testified that Mr. Daniel was unsuccessful in purchasing cocaine from the Defendant and that Mr. Daniel believed the Defendant knew Mr. Daniel was a confidential informant. Detective Ethridge stated that he never recorded telephone conversations between the Defendant and Mr. Daniel.

Upon questioning by the trial court, Detective Ethridge testified that he did not hear the conversation between the Defendant, Mr. Frye, and Officer Mann when the Defendant answered the door. Detective Ethridge stated that he arrived at the Defendant's home at 7:05 a.m. and that the search concluded at about 10:45 a.m. Detective Ethridge said that only one police car was parked in the Defendant's driveway and that the other police cars were "staged down the road." Detective Ethridge stated that he did not think the police dog was "even out of the vehicle" when Officer Mann and Mr. Frye spoke with the Defendant at the door.

The trial court denied the Defendant's motion to suppress and found that the Defendant signed a community corrections agreement which stated that a case officer "could come to his home, visit his home, and he would have to comply with any instructions given by the officer with regards to that visit." The court stated that the Defendant was later transferred to probation, that he signed a probation agreement in April 2014, and that the agreement specified that the Defendant was subject to searches of his home at any time. The court credited the testimony of Mr. Frye and Detective Ethridge and found that the Defendant gave consent to search, based upon both signed agreements and the testimony presented at the hearing. The court also determined that

reasonable suspicion supported the search, based on Detective Ethridge's testimony that Mr. Daniel claimed he had purchased cocaine from the Defendant.

Following the denial of the motion to suppress, the Defendant pleaded guilty to one count of unlawful possession of a firearm, misdemeanor possession of a Schedule II drug, and misdemeanor possession of a Schedule IV drug. The Defendant reserved the following certified question:

> Whether the trial court correctly ruled following a suppression hearing held on February 8, 2016 (1) that the defendant did voluntarily consent to a search of his residence on the morning of May 22, 2014, and (2) that, even without proper consent, there existed "reasonable suspicion" justifying a probation search of the defendant's residence?

Tennessee Criminal Procedure Rule 37(b)(2)(A) provides that an appeal can be taken from a plea of guilty if the Defendant enters into a plea agreement and explicitly reserves, with the consent of the State and the trial court, a certified question of law that is dispositive of the case. *See* Tenn. R. Crim. P. 37(b)(2)(A)(i)-(iv); *State v. Armstrong*, 126 S.W.3d 908 (Tenn. 2003). "An issue is dispositive when this court must either affirm the judgment or reverse and dismiss. An issue is never dispositive when we might reverse and remand[.]" *State v. Wilkes*, 684 S.W.2d 663, 667 (Tenn. Crim. App. 1984). Furthermore, the fact that the defendant, the State, and the trial judge have agreed the issue is dispositive does not bind this court. *State v. Preston*, 759 S.W.2d 647, 651 (Tenn. 1988). "[T]he appellate courts must . . . determine if the record on appeal demonstrates how that question is dispositive of the case . . . . If the appellate court does not agree that the certified question is dispositive, appellate review should be denied." *Id*. (citing *State v. Jennette*, 706 S.W.2d 614, 615 (Tenn. 1986)); *see State v. Dailey*, 235 S.W.3d 131, 134-35 (Tenn. 2007). The certified question must also clearly identify "the scope and limits of the legal issue reserved." *See* Tenn. R. Crim. P. 37(b)(2)(A)(ii).

The Defendant argues that any consent to the search was coerced because three officers, a probation officer, and a police dog came to his home to conduct the search at 7:05 a.m., that the Defendant was told that it would be in his best interest to cooperate, and that the officers did not request his consent. The Defendant also argues that the police officers did not possess reasonable suspicion to conduct the warrantless search. The State responds that the court properly denied the Defendant's motion because the Defendant gave consent to search the home. In the alternative, the State argues that reasonable suspicion supported the search.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and

resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. Warrantless seizures are "presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the . . . seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997); *see Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000).

One such exception to the warrant requirement exists for a search conducted pursuant to valid consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). "The consent, to be valid, must be 'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" *State v. Ingram*, 331 S.W.3d 746, 760 (Tenn. 2011) (quoting *State v. Berrios*, 235 S.W.3d 99, 109 (Tenn. 2007). In determining whether consent was the result of coercion, this court may consider factors such as: (1) time and place of the encounter, (2) whether the encounter was in a public or secluded place, (3) the number of officers present, (4) the degree of hostility, (5) whether weapons were displayed, (6) whether consent was requested, and (7) whether the consenter initiated the contact with the police. *See State v. Cox*, 171 S.W.3d 174, 185 (Tenn. 2005). "'The question [of] whether a consent to a search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.'" *Id*. at 184 (quoting *Schneckloth*, 412 U.S. at 227).

At the motion to suppress hearing, Mr. Frye testified that he and Officer Mann spoke with the Defendant at his front door and informed the Defendant that the officers were there to conduct a search of the home. Mr. Frye stated that the Defendant allowed the officers in the home to conduct the search. Upon further questioning by the trial court, Officer Frye said that the Defendant consented to the search. Mr. Frye said that he stayed outside with the Defendant and the Defendant's girlfriend while the search occurred. Detective Ethridge testified that the search began at about 7:05 a.m. and concluded at 10:45 a.m. and that the Defendant did not withdraw his consent.

Detective Ethridge testified that only one police car was parked in the Defendant's driveway and that the police dog was in the car while Officer Mann and Mr. Frye spoke with the Defendant. Mr. Frye testified that when the officers approached the Defendant's home, none of the officers had "weapons drawn" and that the blue lights were not activated on their police cars. The trial court credited the testimony of Mr. Frye and Detective Ethridge. We conclude that the evidence does not preponderate against the trial court's determination that the Defendant consented to the search. The court did not err by denying the Defendant's motion to suppress, and the Defendant is not entitled to relief on this basis.

Our conclusion that the search was constitutional based on the Defendant's consent is dispositive of this appeal. Because of the possibility of further review as to the consensual search, however, we will address the second part of the Defendant's certified question: whether the search was supported by reasonable suspicion. *See, e.g., Jacobs v. State*, 450 S.W.2d 581 (Tenn. 1970) (mem.) (stating that the intermediate court erred by pretermitting its consideration of remaining issues after concluding that error existed as to one issue); *State v. Pendergrass*, 13 S.W.3d 389, 395 (Tenn. Crim. App. 1999) (concluding that, despite insufficiency of the evidence to support the Defendant's convictions, an intermediate court must, nevertheless, address the merits of the remaining issues).

Despite the constitutional protection from unreasonable searches, "inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled." *State v. Knight*, 534 U.S. 112, 119 (2001) (internal quotation marks and citation omitted). A trial court, therefore, is permitted to "impose reasonable conditions [of probation] that deprive the offender of some freedoms enjoyed by law-abiding citizens." *Id.* A defendant released on probation has a diminished protection from warrantless searches. *Id.* at 121. A search of a probationer's home "requires no more than reasonable suspicion . . . [to] the degree . . . [that] there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable." *Id.*; *see United States v. Cortez*, 449 U.S. 411, 418 (1981). Therefore, "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable" within the meaning of the Fourth Amendment. *Knight*, 534 U.S. at 121; *see State v. Willie Clark Bennett*, No. E2010-00859-CCA-R3-CD, 2011 WL 1045646 (Tenn. Crim. App. Mar. 22, 2011); *see State of Tennessee v. Angela Carrie Payton Hamm and David Lee Hamm*, W2016-01282-SC-R11-CD, 2017 WL 3447914 (Tenn. Crim. App. Jan. 4, 2017), *perm. app. granted* (Tenn. Aug. 13, 2018).

The trial court determined that reasonable suspicion supported the warrantless search based on Mr. Daniel's claiming he purchased cocaine from the Defendant. Detective Ethridge testified that Mr. Daniel claimed he purchased cocaine from the

Defendant days after officers searched Mr. Daniel's home and found four ounces of cocaine. Detective Ethridge stated that Mr. Daniel agreed to serve as a confidential informant, that Mr. Daniel did not make any controlled purchases from the Defendant, and that the police did not attempt to record telephone conversations between Mr. Daniel and the Defendant. Detective Ethridge said that a GPS tracking device was placed on Mr. Daniel's car before the search of Mr. Daniel's home and that records from the GPS tracking device did not reflect Mr. Daniel's traveling to the Defendant's home. Detective Ethridge stated that a surveillance camera was placed outside the Defendant's home and that the surveillance did not corroborate Mr. Daniel's claim that the Defendant sold cocaine from his home. The evidence does not corroborate Mr. Daniel's claim that the Defendant sold cocaine from his home. We conclude that at the time of the search, the officers did not have a reasonable suspicion to believe the Defendant was engaged in criminal activity.

The evidence preponderates against the trial court's determination that reasonable suspicion supported the search of the Defendant's home. However, because we conclude that the Defendant gave valid consent to the search, the court properly denied the Defendant's motion to suppress. In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE